IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MADISON NATIONAL LIFE
INSURANCE COMPANY, INC.,

               Plaintiff,

     v.

POLYSYSTEMS, INC.,

               Defendant.

OPINION AND ORDER

08-cv-387-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is a breach of contract action that was originally brought in the Circuit Court for Dane County, Wisconsin.  In its complaint, plaintiff Madison National Life Insurance Company, Inc. alleges that defendant PolySystems, Inc. unilaterally repudiated a licensing agreement and refused to perform its obligations under the agreement. Dkt. #1-3.  On July 7, 2008, defendant PolySystems, Inc. properly removed the case to this court.  Dkt. #1-1. Jurisdiction is present.  28 U.S.C. §§ 1332 & 1441.

The parties have both filed motions for summary judgment.  Dkts. ##21 & 28.  I conclude that no reasonable jury could find defendant liable for an anticipatory breach of the licensing agreement.  Accordingly, defendant's summary judgment motion will be

granted and plaintiff's will be denied.

As an initial matter, the parties dispute whether a May 2008 letter sent by defendant's attorneys is admissible in evidence. In the letter, counsel explained defendant's position that it was not required to refund license fees as plaintiff demanded and proposed that the parties proceed as discussed in February. Plaintiff seeks to introduce the letter because it refers to defendant's attorneys' conclusion that "the License Agreement ha[d] been materially breached" by plaintiff. Graber Supp. Decl., dkt. #40, exh. 3. However, as defendant correctly notes, the letter is immaterial as well as inadmissible under Fed. R. Evid. 408. It is immaterial because it was received after plaintiff had already deemed the agreement repudiated. The letter is dated May 23, 2008, which is more than a month after plaintiff sent defendant a letter requesting a full refund and more than two months after plaintiff stopped implementing the software and made an oral request for a full refund. Plaintiff has made it clear in its complaint and summary judgment briefs that it believes that defendant's statements and conduct in February 2008 established an anticipatory repudiation of the agreement. Further, in April 2008, plaintiff advised defendant that it believed that defendant had already refused to perform by then and that plaintiff wanted a refund. What defendant said after February or, at the latest, after April, is immaterial in determining whether defendant's actions and statements in February constituted an anticipatory repudiation of the agreement.

2

In addition to being immaterial, the letter cannot be used as evidence without violating Fed. R. Evid. 408, which states in relevant part:

> Evidence of the following is not admissible on behalf of any party, when offered to prove liability for . . . a claim that was disputed as to validity . . . :
>
>> conduct or statements made in compromise negotiations regarding the claim . . . .

The letter proposes a resolution to the parties' dispute and states in the heading, "***For Settlement Purposes Only[.]***" Graber Supp. Decl., dkt. #40, exh. 3.

Although the letter falls under Rule 408's prohibition, plaintiff contends that Rule 408 does not apply; if it did, defendant could tell plaintiff that plaintiff had breached the contract and then "change its mind" and hide behind Rule 408.  Plt.'s Reply Br., dkt. #37, at 9-10 n.5.  Plaintiff cites <u>Bankcard America, Inc. v. Universal Bancard Systems, Inc.</u>, 203 F.3d 477, 484-85 (7th Cir. 2000), in support of its contention that the letter is admissible. In <u>Bankcard America</u>, 203 F.3d at 484, the Court of Appeals for the Seventh Circuit noted:

> The purpose of Rule 408 is to encourage settlements.  Settlements will not be encouraged if one party during settlement talks seduces the other party into violating the contract and then, when settlement ultimately is not reached, accuses the other party at trial of violating the contract.  To use Rule 408 to block evidence that the violation of the contract was invited would be unfair.

Defendant's letter did not encourage plaintiff to breach the agreement and defendant is not contending in this lawsuit that plaintiff breached the agreement.  Thus, finding the letter inadmissible under Rule 408 would not contravene the holding in <u>Bankcard America</u>.

3

Accordingly, I will not consider the letter in deciding the parties' motions for summary judgment.

The following facts are gathered from the parties' proposed findings of fact and are both material and undisputed.

## UNDISPUTED FACTS

### A.  The Parties and Diversity Jurisdiction

Plaintiff Madison National Life Insurance Company, Inc. is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.  Plaintiff sells life, accident and health insurance policies.  Besides selling its own policies, plaintiff purchases blocks of business from other insurance companies that sell the underlying policies, referred to as ceding companies.  When purchasing blocks of business, plaintiff can assume all or a portion of the risk associated with the underlying policies through reinsurance agreements.  In its complaint, plaintiff seeks at least $232,500 plus interest in damages from defendant.

Defendant PolySystems, Inc. is an Illinois corporation with its principal place of business in Chicago, Illinois.  Defendant licenses its software systems and support services to the insurance industry.

### B.  The Software Licensing Agreement

4

In March 2007, the parties began discussions about plaintiff's licensing actuarial software from defendant.  The actuarial software included systems designed for use in the insurance industry and provided assistance with statutory and tax valuations, liability projections, analysis of GAAP and statutory profits and asset modeling.  After some negotiations regarding the language in the license contract and plaintiff's insertion of some additional language, the parties came to agreement about the proper language.  On July 3, 2007, defendant sent plaintiff a final version of the software licensing agreement.  On July 5, 2007, plaintiff signed and returned the agreement.  On July 10, 2007, defendant signed the agreement.

The portion of the agreement relevant to this lawsuit is section 6. B., which states:

Limits on Use.  Customer shall not use The System for the benefit of or to provide services to any other third party, other than those of its affiliated companies which are not service bureaus.  The Customer shall not use The System to provide access to the software as a service bureau.  The Customer agrees to protect [defendant's] proprietary interests in the same manner Customer protects its own proprietary interests and in no event in a manner less restrictive than is customary in the software industry.

Notwithstanding the foregoing, Customer may use the System within its prescribed functions as outlined in the Licensed Program Descriptions in Schedule A, with respect to any blocks of business which the Customer or one of its affiliated companies has assumed not less than 20% of the total mortality, persistency, or investment risk.

Bailey-Rihn Decl., dkt. #25-11, at 4.  Under the agreement, plaintiff was to pay $200,000 for the initial licensing fees, due upon execution of the license agreement, as well as ongoing

5

support fees equal to 20% of the license fees.  The cost of implementing the software was estimated to be $25,000.  The agreement states that it "shall be governed by and construed in accordance with the laws of the State of Illinois."  Id. at 9.

### C.  Installation and Implementation of the Software

Defendant delivered its software and documentation to plaintiff approximately one week after the license agreement was executed and installed the software at plaintiff's office by July 31, 2007.  The parties agreed that before implementing all the software systems listed in the agreement, they would focus on implementing the Life Master and UL Master software systems, which were to be used for traditional life and universal life insurance policies.  The implementation process began in July 2007.  Defendant acted as a consulting resource for plaintiff during the coding and system set-up phase of the implementation, which continued until December 2007 when plaintiff had to suspend implementation to complete other year-end responsibilities.  Plaintiff planned to resume implementation after its completion of those year-end responsibilities.  However, the software systems were never fully implemented.

### D.  Plaintiff's Use of the Software and Termination of the Agreement

In February 2008, plaintiff was in the process of purchasing a block of business from

6

Unity Mutual, that purchase would result in plaintiff's assumption of 17% of the overall risk for the block of business.  Plaintiff wanted to use defendant's software system for the new business.

On February 5, 2008, plaintiff contacted defendant, seeking defendant's express written consent to use the software for the Unity block of business.  The new business was not covered by the parties' agreement because plaintiff would not be assuming 20% of the overall risk of the block of business.  Plaintiff told defendant that the software would be used entirely in its Madison offices and that the block of business would be administered for plaintiff's own use and benefit and that it would report statutory and tax reserves to Unity for its share of the block of business.  Plaintiff asked defendant to waive the 20% restriction.

Defendant prepared an addendum to the licensing agreement that would allow plaintiff to use the software for the Unity block of business and sent plaintiff the addendum on February 11, 2008.  Included in the addendum was the following language:

> All future transactions whereby valuation services are provided to a third party will be reviewed on a case by case basis as they apply to Limits on Use section of Agreement No. 1[209].

Bailey-Rihn Decl., dkt. #25-13, at 3.  Plaintiff would not accept the addendum because the language in the addendum suggested that plaintiff would have to obtain defendant's permission to use the software for blocks of business in which it assumed more than 20% of the total risk.  This would represent a change from the initial license agreement.  (Although

7

it is immaterial to the outcome of this lawsuit, I note that the parties have devoted great effort to disputing whether defendant also explicitly told plaintiff that it would be in violation of the agreement if it provided valuation reports to ceding companies from which it had purchased a block of business even if it assumed more than 20% of the investment risk on the block.)

In discussing the addendum and how the software could be used, defendant sent plaintiff an email on February 12, 2008, which said in relevant part:

> We have spent considerable time considering your business needs. PolySystems can not allow the unencumbered use of our Software to provide valuation services. Your need to use the Systems for your target companies has the potential to eliminate both existing and future revenue for PolySystems.

> We will certainly work with [Madison National Life Insurance] to describe a schedule that makes sense and allows you to proceed without permission and with known costs associated with your potential agreements.

> The agreement Barry redlined gives you permission to use the software on behalf of Unity Mutual. If that addendum is also acceptable to you we can sign and send out 2 originals today.

Bailey-Rihn Decl., dkt. #25-14, at 2. On February 18, 2008, defendant sent an email to plaintiff with a revised addendum attached. In part, the email said, "Attached is a revised addendum to our license agreement that we believe properly addresses our business arrangement. We welcome your comments and hope this leads to a healthy relationship." Bailey-Rihn Decl., dkt. #25-15, at 2. The revised addendum provided consent to use the

8

software for the Unity block of business.  It also included language granting plaintiff permission to use the software to provide valuation services to future blocks of business if plaintiff satisfied several conditions, including paying additional licensing fees in accordance with a growth chart.

On February 21, 2008, Barry Koklefsky, plaintiff's chief actuary at the time, emailed Bob Keating, defendant's Vice President of Sales, saying

> I appreciate your working up an addendum to the agreement that addresses [Madison National Life's] [b]usiness and how [PolySystems'] systems fit within that business. I've formulated some revisions that we should discuss further before proceeding. Both marked up and clear versions are included.

> I haven't spoken with Larry [Graber, president of Madison National Life,] since last week, but as far as I know, he is still looking for a refund.

Bailey-Rihn Decl., dkt. #25-15, at 2.  Plaintiff's president, Larry Graber, would not agree to any of defendant's proposed addendums.  He believed their language contradicted the original agreement by requiring plaintiff to pay additional fees to use the software to provide valuation reports to ceding companies for which plaintiff purchased blocks of business in which it had assumed more than 20% of the investment risk.  He put a stop on implementation of the software and asked defendant to refund the fees plaintiff had paid. Although the system had not been tested when plaintiff stopped the implementation, plaintiff was still coding data.  Defendant could do no further work until plaintiff finished that task.  Up to that point, defendant had performed all of its contractual obligations.  At

9

no time did defendant notify plaintiff that it was unwilling to perform any of its obligations under the licensing agreement.

On April 28, 2008, plaintiff wrote defendant, memorializing the problems that required it to demand a full refund of the license fees. Bailey-Rihn Decl., dkt. #25-17, at 2-3. Plaintiff noted that the reason it sought to "undo the deal" was because defendant had taken the position that plaintiff would violate the license agreement if it used the software to provide reserve reports to even those ceding companies that fell within the terms of the parties' original agreement. When defendant rejected the demand, plaintiff filed this lawsuit on June 12, 2008.

OPINION

A. Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is appropriate "when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Goldstein v. Fidelity & Guaranty Insurance Underwriters, Inc., 86 F.3d 749, 750 (7th Cir. 1996) (citing Fed. R. Civ. P. 56); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In deciding a summary judgment motion, the district judge's function "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Additionally, "it is

10

the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. at 248.  Furthermore, all reasonable inferences from undisputed facts should be drawn in favor of the nonmoving party.  Baron v. City of Highland Park, 195 F.3d 333, 338 (7th Cir. 1999).

However, the nonmoving party cannot simply rest upon the pleadings once the moving party has made a properly supported motion for summary judgment; instead the nonmoving party must submit evidence to "set out *specific* facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added).  At that point, it becomes the nonmoving party's burden to demonstrate that there is a genuine issue of material fact, that is, that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.

## B.  Choice of Law

The parties assume that Illinois law governs their contract dispute.  In addition, the parties' licensing agreement includes a provision stating that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Illinois." Cpt., dkt. 1-3.  Accordingly, I will apply Illinois law to the agreement.

## C.  Anticipatory Repudiation

11

"An anticipatory repudiation has been defined as a manifestation by one party to a contract of an intent not to perform its contractual duty when the time fixed in the contract has arrived.  The party's manifestation must clearly and unequivocally be that it will not render the promised performance when it becomes due."  Pope ex rel. Pope v. Economy Fire & Casualty Co., 335 Ill. App. 3d 41, 46, 779 N.E.2d 461, 465 (2002) (citations omitted). Plaintiff contends that defendant's statements, conduct and demand for performance of the agreement only within its interpretation of the agreement satisfy the clear and unequivocal manifestation requirement, but the undisputed facts establish otherwise.  Accordingly, I conclude that defendant did not commit an anticipatory repudiation of the license agreement because it never clearly and unequivocally manifested an intent not to perform.

Plaintiff contends that several of defendant's statements in February 2008 provide a clear and unequivocal manifestation that defendant intended not to perform its duties under the license agreement.  Specifically, plaintiff points to defendant's statements that plaintiff would be in violation of the agreement if it used the software to provide reports to ceding companies from which plaintiff purchased qualifying blocks of business.  In other words, plaintiff contends that defendant refused to agree that plaintiff was permitted to use the software in a manner acceptable under section 6.B. of the agreement.  Although defendant denies ever making such statements, the dispute is immaterial.  Even if it did make such statements, defendant did not commit an anticipatory repudiation or breach of

12

the agreement.  (I note that defendant agrees that such statements would not be supported by the agreement.)

Statements that plaintiff would be violating or breaching the agreement if it used the software to produce reports for certain ceding companies do not create a clear and unequivocal manifestation that defendant intended not to perform its duties under the agreement.  As of February 2008, when defendant allegedly made those statements, it had performed all its contractual obligations.  The next duty defendant had to perform was to test the software.  At no time did defendant ever notify plaintiff that it was unwilling to perform the testing.

Plaintiff cites Intersport, Inc. v. National Collegiate Athletic Assocation, 381 Ill. App. 3d 312, 885 N.E.2d 532 (2008), in support of its contention that defendant's alleged statements are evidence of an anticipatory repudiation of the agreement.  Plaintiff summarizes Intersport as saying that the "defendant breached [the] license agreement when it sent a letter asserting that Plaintiff's proposed actions would violate the license grant." Plt.'s Reply Br., dkt. #37, at 10-11.  This summary is incorrect.  Intersport provides an example of the path plaintiff should have taken to enforce the licensing agreement.

In Intersport, 381 Ill. App. 3d at 315, 855 N.E.2d at 535, the plaintiff entered into a licensing agreement with the defendants to use a trademark.  The plaintiff planned to use the trademark on a mobile wireless media network, but the defendants believed that this use

13

was not permitted under the agreement.  Id. at 315, 855 N.E.2d at 536.  The defendants

sent the plaintiff "a letter asserting that if [plaintiff] were to provide [the trademark to a

third party] for distribution to mobile communications subscribers, [plaintiff] will have

violated the license agreement."  Id.  Believing that the language of the license agreement

granted it authority to use the trademark on a mobile wireless media network, the plaintiff

sought a declaratory judgment that such a use of the trademark was within its rights under

the agreement.  Id. at 315-16, 855 N.E.2d at 536.  The defendants counterclaimed for

breach of contract.  Id.

The district court denied the defendants' motion for partial summary judgment on

the plaintiff's declaratory judgment claim and their breach of contract claim, finding that the

agreement permitted the plaintiff's use of the trademark on a mobile wireless media network.

Id. at 317, 855 N.E.2d at 537.  The plaintiff responded by filing a motion for entry of

judgment, which the court granted.  Id.  The appellate court upheld the district court's

decision.  Id. at 314, 855 N.E.2d at 263.  The defendants were not found to have breached

any agreement by sending a letter to the plaintiff.

In this case, defendant allegedly told plaintiff that plaintiff would be violating the

parties' agreement if it used the software to provide reserves reports to ceding companies

from which plaintiff purchased blocks of business in which it assumed more than 20% of the

investment risk.  This is evidence of a disagreement over the scope of plaintiff's rights under

14

the agreement.  At the most, such statements can be characterized as indefinite statements about defendant's future performance because they leave it uncertain how defendant would respond if plaintiff were to act in violation of defendant's interpretation of the agreement. Illinois courts have explained that "[t]here is no anticipatory repudiation if a party does no more than make doubtful or indefinite statements that it will not perform or that it will perform only within its interpretation of the contract."  Draper v. Frontier Insurance Co., 165 Ill. App. 3d 739, 745, 638 N.E.2d 1176, 1181 (1994).  Plaintiff has adduced no evidence that defendant made any statement about future performance.  Instead, plaintiff assumed that because defendant made statements that plaintiff would violate the agreement if it used the software to provide reports to ceding companies, defendant would not perform its obligations under the agreement.  Statements that plaintiff's actions would violate the agreement would serve to inform plaintiff that defendant might seek breach of contract remedies, not that it would not perform its duties.

Further, plaintiff is in error when it argues that if such statements are not clear enough for an anticipatory repudiation, it would have to wait for defendant to refuse to perform and then file a breach of contract claim.  Plaintiff could have asked defendant in writing whether it intended to perform its duties even if plaintiff used the software in the potentially prohibited manner or, like the plaintiff in Intersport, sought a declaratory judgment that such a use was not a breach of the agreement.  Instead, plaintiff has pursued

an anticipatory repudiation claim even though the undisputed facts show that defendant never notified plaintiff that it was unwilling to perform any of its obligations under the licensing agreement.  No reasonable jury could find that any of defendant's statements were a clear and unequivocal manifestation by defendant of an intent not to perform its duties under the licensing agreement.

Although defendant's words or statements do not evidence a repudiation, it is possible to repudiate a contract by other conduct, Busse v. Paul Revere Life Insurance Co., 341 Ill. App. 3d 589, 594, 793 N.E.2d 779, 783 (2003) (citation omitted).  However, defendant's conduct provides no evidence of a repudiation.  Plaintiff contends that the proposed addendums defendant sent plaintiff in February 2008 support the conclusion that defendant would not perform its duties unless plaintiff agreed to pay new licensing fees.  Plaintiff is mistaken.  Its contention is based on a mischaracterization of the addendums as evidence of repudiative conduct.  Defendant's request for new fees came in the course of negotiations regarding changes to the agreement that were suggested by plaintiff.  Defendant did not initiate discussion with plaintiff and ask to change the agreement by requiring new licensing fees.  It was plaintiff who was requesting permission to use the software in a manner restricted by the agreement, that is, in a manner that would be in violation of section 6.B.'s 20% restriction.

In response, defendant created an addendum to the agreement to permit this specific

16

use and it included some new terms about fees for future blocks of business.  Plaintiff's concerns about the changes and their effect upon the rights plaintiff had under the original agreement arose in the course of plaintiff's attempt to use the software in a manner not permitted by the agreement.  Sending these addendums to plaintiff does not show clear and unequivocal conduct to repudiate the agreement.

Moreover, there is no evidence supporting plaintiff's contention that defendant insisted that it was obligated to perform only according to its own incorrect interpretation of the agreement's terms.  Id.  ("[A]lthough a party may state that it intends to honor its obligations, it may still repudiate the contract by *insisting* that it is obligated to perform only according to its own incorrect interpretation of the contract's terms." (Emphasis added) (Citations omitted)).  Plaintiff contends that defendant refused to perform unless plaintiff agreed to change the agreement by paying new licensing fees.  Plaintiff always maintained the position that it could use the software to provide reserves reports to certain ceding companies without paying any additional fees.  When plaintiff brought up this point in explaining why it could not agree to defendant's proposed addendums, defendant responded by explaining that "PolySystems can not allow the unencumbered use of our Software to provide valuation services."  Bailey-Rihn Decl., dkt. #25-14, at 2.  Although defendant's response said nothing about its willingness to perform, plaintiff assumed that this statement meant that defendant would not perform its duties unless plaintiff agreed to pay more

17

licensing fees, which plaintiff refused to do.  Relying on this assumption, plaintiff asked for a refund and stopped coding data for installation of the software.

Although plaintiff does not dispute that defendant never explicitly refused to perform, it characterizes defendant's addendums as an insistence or demand that plaintiff agree to pay more fees.  Plaintiff contends that this insistence demonstrated defendant's refusal to perform except according to its own incorrect interpretation of the agreement.  The undisputed facts establish otherwise.  It is undisputed that in the approximately 16 days between plaintiff's request to use the software with its Unity purchase and plaintiff's decisions to stop implementation and demand a refund, defendant continued to rework the necessary addendum to satisfy plaintiff's concerns.  In an email sent on February 21, 2008 to Bob Keating, defendant's vice president of sales, from Barry Kiklefsky, plaintiff's chief actuary at the time, Koklefsky noted that although plaintiff's president desired a refund of the licensing fees, "I appreciate your working up an addendum to the agreement that addresses [Madison National Life's] [b]usiness and how [PolySystems'] systems fit within that business."  Bailey-Rihn Decl., dkt. #25-15, at 2.  This evidence does not show that defendant *insisted* that plaintiff agree to the addendums if plaintiff wanted defendant to perform its duties.  Instead, it shows that defendant was attempting to work out a mutual compromise that it believed would benefit both parties.

Further, when plaintiff exercised its right to refuse to agree to the proposed

18

addendums, defendant did not respond to plaintiff's refusal by saying or even implying that plaintiff had to agree to any of the addendums or defendant would not carry out its duties under the agreement.  Thus, there is nothing in defendant's actions or statements that demonstrates an insistence or a demand that performance occur in accordance with only its interpretation of the agreement.

Neither defendant's statements nor conduct, even when viewed together, evidence a clear and unequivocal manifestation of an intent not to perform by defendant.  At most, the undisputed facts establish that the parties disputed the scope of plaintiff's rights under the agreement.  Such evidence is not enough to allow a reasonable jury to find that the agreement was repudiated.  The requirement that the repudiation be clear and unequivocal is a strict one.  Commonwealth Edison Co. v. Decker Coal Co., 612 F. Supp. 978, 981 (N.D. Ill. 1985).  In light of the undisputed facts, plaintiff has failed (1) to prove that it is entitled to summary judgment or (2) to provide specific facts showing a genuine issue for trial to defeat defendant's request that judgment be entered in its favor because it did not repudiate the agreement.  Accordingly, plaintiff's motion for summary judgment will be denied and defendant's will be granted.

ORDER

IT IS ORDERED that:

19

1.  Plaintiff Madison National Life Insurance Company, Inc.'s motion for summary judgment, dkt. #21, is DENIED;

2.  Defendant PolySystems, Inc.'s motion for summary judgment, dkt. #28, is GRANTED;

3.  The clerk of court is directed to enter judgment DISMISSING the case in favor of defendant.

Entered this 28th day of May, 2009.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge